956 So.2d 369 (2007)
Park Allen TRITLE, Appellant
v.
Casi Alicia TRITLE, Appellee.
No. 2005-CA-01768-COA.
Court of Appeals of Mississippi.
May 15, 2007.
*371 Dixie Lynn Vaughn, Gulfport, attorney for appellant.
Darryl A. Hurt, Lucedale, attorney for appellee.
Before KING, C.J., IRVING and ROBERTS, JJ.
ROBERTS, J., for the Court.

SUMMARY OF THE CASE
¶ 1. This appeal originates from Park and Casi Tritle's divorce before the George County Chancery Court. Park and Casi agreed to a divorce based on irreconcilable differences. They left it to the chancellor to determine the remaining issues, as they could not resolve those issues themselves. Most pertinent to our present purposes, the chancellor (a) awarded Casi custody of the two children, and (b) ordered Park to pay Casi periodic alimony. Aggrieved, Park appeals and takes issue with the chancellor's decisions regarding custody and alimony. Specifically, Park raises the following four issues, listed verbatim:
I. WHETHER THE COURT COMMITTED MANIFEST ERROR IN ITS FINDINGS OF FACT AND FAILED TO PROPERLY APPLY THE ALBRIGHT FACTORS WHICH RESULTED IN AN AWARD OF CUSTODY WHICH IS NOT IN THE BEST INTEREST OF THE CHILDREN.
II. WHETHER THE COURT WAS CLEARLY ERRONEOUS IN WEIGHING AN ALBRIGHT FACTOR IN FAVOR OF CASI.
III. WHETHER THE COURT USED AN INCORRECT LEGAL STANDARD IN AWARDING CUSTODY, AMOUNTING TO REVERSIBLE ERROR.
IV. WHETHER THE COURT ABUSED ITS DISCRETION AND COMMITTED MANIFEST ERROR IN GRANTING CASI PERIODIC ALIMONY.
Finding no error, we affirm.

FACTS AND PROCEDURAL HISTORY
¶ 2. Park and Casi Tritle were married on August 6, 1983, in Milford, New Hampshire. *372 On March 30, 1994, while living in Spain, Park and Casi had twins, Park Austin Tritle and Tatiana Marie Tritle.[1] Eventually, Park and Casi made their home in Lucedale, Mississippi. Park and Casi maintained their marriage until March of 2004.
¶ 3. In the spring of 2004, Park filed a complaint for divorce.[2] After procedural volleys involving a counterclaim by Casi and an amended complaint by Park, Park and Casi agreed to divorce based on irreconcilable differences. On January 11, 2005, Park and Casi went to trial before the George County Chancery Court. Though they had agreed to divorce based on their irreconcilable differences, Park and Casi left it to the chancellor to resolve child custody, child support, alimony payable to Casi, distribution of debt, distribution of retirement accounts, and ownership of the children's passports. Park and Casi presented evidence over the course of four non-sequential days.[3]
¶ 4. On June 15, 2005, the chancellor rendered a thorough set of findings of fact and conclusions of law. Among other things, the chancellor (a) awarded "paramount" custody of the children to Casi, (b) granted Park visitation, (c) ordered Park to pay Casi $557.88 in monthly child support payments, (d) ordered Park to maintain health insurance on the children, (e) ordered Park to pay Casi $375 per month in periodic alimony, and (f) ordered Park and Casi to equally divide their retirement accounts. The chancellor ordered Casi's attorney to prepare a judgment that corresponded to the chancellor's findings of fact and conclusions of law. That judgment was filed on August 18, 2005. Aggrieved by the chancellor's decisions regarding custody and alimony, Park appeals.

ANALYSIS
I. WHETHER THE COURT COMMITTED MANIFEST ERROR IN ITS FINDINGS OF FACT AND FAILED TO PROPERLY APPLY THE ALBRIGHT FACTORS WHICH RESULTED IN AN AWARD OF CUSTODY WHICH IS NOT IN THE BEST INTEREST OF THE CHILDREN.
II. WHETHER THE COURT WAS CLEARLY ERRONEOUS IN WEIGHING AN ALBRIGHT FACTOR IN FAVOR OF CASI.
¶ 5. In her findings of fact and conclusions of law, the chancellor found that Casi was the proper person to have custody of the children. The chancellor reached her decision after an analysis of the familiar factors set forth in Albright v. Albright, 437 So.2d 1003 (Miss.1983). Park claims the chancellor committed reversible error.
¶ 6. In particular, the chancellor found that six of the Albright factors favored Casi: (1) continuity of care prior to the separation, (2) parenting skills and willingness and capacity to provide primary child care, (3) employment of the parents and the responsibility of that employment, (4) moral fitness of each parent, (5) home, *373 school, and community record of the children, and (6) other relevant factors. The chancellor did not find that any factor favored placing the children in Park's custody. Instead, the chancellor found that the remaining Albright factors favored neither Park nor Casi.
¶ 7. On appeal, Park submits that the chancellor should not have found that any factors favored placing custody with Casi. Additionally, Park takes the position that, although the chancellor found that physical and mental health of the parents and stability of the home environment favored neither him nor Casi, the chancellor should have found that those two factors favored him.
¶ 8. The standard of review in child custody cases is rather limited. Lee v. Lee, 798 So.2d 1284 (¶ 14) (Miss.2001). In child custody cases, the polestar consideration is the best interest and welfare of the child. Albright, 437 So.2d at 1005. The chancellor is the finder of fact in a child custody dispute. Funderburk v. Funderburk, 909 So.2d 1241 (¶ 10) (Miss. Ct.App.2005). As the finder of fact, the chancellor is vested with the responsibility to hear the evidence, assess the credibility of the witnesses, and determine ultimately what weight and worth to afford any particular aspect of the proof. Id. When it comes to finding facts, we defer to the chancellor in that we will not substitute our judgment for the chancellor's. Id. Even if we would have given greater weight to different testimony, so long as substantial credible evidence supports the chancellor's decision, we will not substitute our opinion for the chancellor's. Id. at (¶ 11). We turn to those factors with which Park takes issue.
a. Continuity of Care Prior to Separation
¶ 9. The chancellor found, "prior to the separation, [Casi] spent the most time with the kids in their daily routine and she was the primary care giver for the kids." Park takes exception to the chancellor's resolution of this factor. According to Park, the chancellor should have found that this factor favored him because he provided primary care for the children prior to the separation.
¶ 10. We may reverse only if the chancellor abused his discretion and the decision was manifestly wrong or clearly erroneous. Horn v. Horn, 909 So.2d 1151 (¶ 20) (Miss.Ct.App.2005). "The word `manifest', as defined in this context, means `unmistakable, clear, plain, or indisputable.'" Lowrey v. Lowrey, 919 So.2d 1112 (¶ 21) (Miss.Ct.App.2005). Given our deferential standard of review, we cannot find that the chancellor erred.
¶11. The chancellor heard conflicting testimony. Casi testified that she provided primary care for the children prior to the separation. However, Park testified that he provided primary care for the children prior to the separation. Park testified that, prior to the separation, he provided primary care for the children because, among other things, he disciplined the children, he took the children to appointments with doctors and dentists, met with teachers, assisted with homework, and shared cooking duties. Park admitted that Casi tended to the children's clothing. There was evidence that Park told the children's teachers to contact him regarding the children, rather than Casi. Casi testified that Park misled teachers into believing that Casi, originally from Spain, could not communicate well. In any event, according to the evidence presented at trial, Park and Casi each provided some degree of care for the children prior to the separation.
¶12. Facing contradicting testimony, it fell to the chancellor to resolve the issue. *374 True enough, Park testified that he and Casi each provided care, but certain evidence corroborated the chancellor's finding. Park testified that, prior to the separation, he often worked between fifty and eighty hour work weeks. Casi's workday ended shortly after the children's school day ended. It is certainly reasonable to conclude that Casi would provide the bulk of primary care where Park had such demanding employment duties. As such, we cannot find that the chancellor was clearly or manifestly wrong.
b. Parenting Skills and Willingness and Capacity to Provide Child Care
¶ 13. The chancellor found:
When Casi is not at work she is with the two minor children. This indicates a commitment to her children especially during this stressful transition. During the times Park has custody of his children, he requires the assistance of his parents due to his work schedule. It is commendable that the paternal grandparents are willing to assist with the children and take an active role in their lives. Casi's work schedule co-insides [sic] with the children's school schedule. While the Court understands Park must work to support himself and his family, he requires child care assistance and Casi does not.
The chancellor found that this factor favored Casi.
¶ 14. Park again claims that the chancellor should have resolved this factor in his favor. Park focuses his argument on his and Casi's respective parenting skills and their individual capacity to provide child care. From the context of Park's argument, it does not appear that he calls Casi's willingness to provide child care into doubt.
¶ 15. As for parenting skills, Park claims that the chancellor should have found that he possesses better parenting skills. According to Park, he possesses better parenting skills because Casi sleeps excessively when she has the children. However, there was no evidence that, when Casi had the children in the home, Casi slept to the degree that it negatively effected her capacity to provide child care. That is, there is no evidence that the children were harmed by Casi's sleeping.
¶ 16. Park also claimed that Casi lacked parenting skills because she had an uncontrollable anger problem. Park's mother, Valley Tritle, testified that Casi spanked Parkie when he was only weeks old. However, Casi vehemently denied that she ever struck Parkie when he was only weeks old. In fact, she testified that Valley lied about that. Accordingly, the chancellor had two versions of that story and had to decide whom she found more credible. The chancellor found Casi more credible. We are not at liberty to substitute our conclusion for the chancellor's. Park, his mother, and his sister all testified that Casi had an uncontrollable temper, but testimony from Casi's supervisor and her friends and co-workers indicated that, over the course of several years, Casi had never lost control of her temper or even had an emotional or angry outburst in their presence. Thus, it seemed that Casi's "uncontrollable" temper, was not so uncontrollable. Park's allegations notwithstanding, there was no evidence that Casi physically abused the children or that the children were afraid of Casi. Accordingly, we cannot find that the chancellor committed reversible error when she did not weigh this factor in favor of Park.
¶ 17. Park calls Casi's parenting skills into doubt in that he claims she lacks proper judgment. Park submits that Casi lacks proper judgment because she smokes around the children. However, Casi testified that she did not smoke in the house. *375 Instead, she smoked outside. The evidence showed that Casi occasionally smoked while the children were in the car, but that she also rolled down the window. There was no evidence that Casi's smoking had adversely affected the children's health. While smoking with the window down with the children in the car may not necessarily be beneficial to the children, we cannot find that it, in and of itself, equates to a lack of proper parenting skills or a lack of parental judgment to the degree that Park has better parenting skills than Casi.
¶ 18. Finally, Park submits that he possesses better parenting skills due to his involvement in the children's extracurricular activities. Park summarizes the children's involvement in extracurricular activities and submits that the distinguishing feature between him and Casi is that he is involved in the children's activities and that "Casi's only activities with the kids are watching TV and an occasional shopping and Mobile trip." Park misinterprets the evidence. There was ample testimony that Casi took the children to various school sporting events and that the children enjoyed going to those games with Casi. Casi also testified that, due to financial reasons, she had to rent movies and watch them at home with the kids, rather than take them to the theater. What is more, Casi testified that the children were already involved in dancing with Park at least two nights a week and that the children needed time to tend to their schoolwork and to socialize with children their own age. We cannot find that the chancellor was clearly erroneous in weighing this factor in favor of Casi.
¶ 19. Park's remaining assertions center on his capacity to provide child care. According to Park, except during his weekly Friday night line dance, he cared for the children when he was not working. Be that as it may, the children testified that, during the weeks they stayed with Park, their grandmother cooked for them and cleaned their clothes. There was ample testimony that Park relied on his parents to assist with caring for the children due to the demands of his job. Park needed his parents' help with the children because he worked later hours and occasionally had to work overnight shifts. Park also needed his parents' help with caring for the children when Park went line dancing on Friday nights. Casi did not need any assistance in caring for the children. Also, Casi only has to work thirteen days during the children's summer break. Casi fulfilled that obligation by working a series of half days.
¶ 20. Additionally, Park points out that his parents have picked up the children from school since the children were in kindergarten. During the separation, Park lived with his parents. Park's father would bring the children to his and Valley's house after school. During the weeks that Casi had custody of the children, Casi picked them up in a matter of minutes. While Casi testified that she did not want to keep the children from their grandparents, there was evidence that the children had the option of riding a bus from their school to the high school at which Casi was employed. Casi's work day would end shortly afterwards, and she could take the children home with her.
¶ 21. According to Park, the children "should not have this long standing pattern disrupted, by having to ride the school bus, as Casi wants, and would seem in violation of the best interests of the children." Though we cannot determine just how this argument is related to his or Casi's parenting skills or their respective capacity to provide child care, if Park is suggesting that it is not in the children's best interests to ride a school bus, we are *376 not nearly prepared to find such. If Park is arguing that it is not in the best interests of the children to make their way home in any way other than by way of their grandparents, then that is not a proper consideration under this analysis. This analysis is solely focused on each parent's parenting skills and willingness and capacity to provide child care. The simple fact is, the chancellor heard sufficient evidence to support her finding that Park needed assistance in providing child care in that Park relied on his parents, whereas Casi did not need as much assistance in providing child care because she did not have to rely on Park's parents.
c. Employment of the Parents:
¶ 22. In determining that this factor favored Casi, the chancellor found:
Casi is employed at the George County High School as a bookkeeper and her employment ends daily when school ends. Park's employment requires supervisory responsibilities. He is sometimes required to fill in for other employees with the ambulance service at the George County Hospital. The Court finds that it is also significant that Park claims he works fewer hours now than before the separation. The Court is concerned that Park, as supervisor may be purposely lessening his work hours for purposes of litigation which would not be the case for the long term if Park continues his employment with the George County Hospital. Park's employment has previously required him to work odd shifts and long hours and it is not unreasonable to assume this type schedule and responsibility could resume in the future.
Park submits that the chancellor erred. We disagree.
¶ 23. At the time of trial, Park worked as the supervisor for the George County ambulance services. Park also handled payroll and, in the event that someone failed to report for work, Park had to fill-in for that absent employee. That could include working overnight twenty-four or forty-eight hour shifts. Park also testified that he was "the" Spanish translator for the emergency room and the obstetrics departments at the hospital. Finally, Park testified that, if there was a significant accident, he was one of three individuals who were capable of operating the "jaws of life" and that he would have to operate a third ambulance if one were necessary.
¶ 24. In contrast, Casi worked as a bookkeeper for the George County High School. Her workday ended shortly after the children's school day ended. She had to work a total of thirteen days during the summer break, and she usually fulfilled her obligation by working a series of half days.
¶ 25. Park's employment is commendable. However, it was not unreasonable for the chancellor to conclude that Park's employment would affect his capacity to provide child care. While Park claims that he had modified his employment obligations, he also testified that he "would love" to work a forty-hour work week. The chancellor could have found that Park hoped to be able to work less, rather than that he would certainly and definitely have decreased his employment responsibilities. In light of the foregoing, we cannot find that the chancellor abused her discretion.
d. Physical and Mental Health of Each Parent
¶ 26. The chancellor's found that this factor favored neither party. According to Park, the chancellor should have found that this factor favored him. Park bases his argument on his relatively good physical and mental health and the fact *377 that the evidence showed that Casi once took Paxil for panic attacks.
¶ 27. There was no testimony that Casi's having taken Paxil had any bearing on her ability to care for the children. The simple fact that Casi took Paxil, without more, does not justify our finding that the chancellor was clearly erroneous when she did not find that this factor favored Park.
e. Moral Fitness of Each Parent
¶ 28. The chancellor found:
Park admitted to having an extra marital sexual relationship with Pamela Sketters. [sic] He testified that Casi's actions justified his extra marital affair. Vallie [sic] Tritle testified that Park had commenced a relationship with another lady in Mobile, Alabama who manages a RV resort where Park takes the children to a line dance. Vallie [sic] Tritle testified that this woman had proposed marriage to Park, at which point he terminated the relationship. Clearly, engaging in these type of relationships during the marriage does not set the appropriate example for young children. It was clear from the testimony of Park and his mother that the children had interacted with the woman from Mobile, Alabama and that they were aware of the strong feelings between their father and this third party. There was no evidence presented that Casi had engaged in moral unfitness.
Accordingly, the chancellor found that this factor favored Casi. Park submits that the chancellor erred.
¶ 29. There was evidence that Park had a significant relationship with a woman named Pamela Skeeters during the separation. Park characterized the relationship as an "affair." Park admitted that it was a sexual relationship and that he traveled to Texas to stay with Pamela when he and Casi separated. Park testified that he traveled to Texas on five separate occasions from September of 2003 to March of 2004. Additionally, Park met Pamela in Las Vegas, Nevada, during October of 2003 and then in Orlando, Florida, during January of 2004.
¶ 30. Park claims that Casi, in effect, drove him into Pamela's arms and that he only had an affair with Pamela after Casi told him to leave the house. Park also attempts to call Casi's morality into question by pointing out that the children were unaware of his relationship with Pamela until Casi told them about it. However, there was substantial evidence to support the chancellor's finding. We will not substitute our view for the chancellor's.
¶ 31. Park cites McCraw v. McCraw, 841 So.2d 1181 (¶ 17) (Miss.2003) and claims that marital fault should not be used as a sanction in awarding custody. That was not the precise holding in McCraw. Rather, McCraw stated, "Sexual misconduct . . . is not per se grounds for denial of custody." Id. (quoting Hollon v. Hollon, 784 So.2d 943 (¶ 25) (Miss.2001)). In any event, the moral fitness of each parent is most certainly a factor to be examined in awarding custody. Id. at (¶ 6).
¶32. Finally, Park notes that he regularly took the children to church, while Casi testified that she did not go to church "as much as she should." That Park attended church with greater regularity than Casi does not render Casi less morally fit than Park or Park more morally fit than Casi. It is simply one consideration among many. We cannot find that the chancellor was clearly erroneous when she weighed this factor in Casi's favor.
f. Stability of the Home Environment
¶ 33. The chancellor found that this factor favored neither party. According to *378 Park, the chancellor should have found that this factor favored him. Park again discusses his parents' involvement in the children's lives. We have discussed the relevant considerations regarding Park's parents' involvement in the children's lives under previous headings. There is no need to repeat our analysis here. Suffice it to say, we cannot find that the chancellor was clearly erroneous. As such, we affirm the chancellor's findings.
h. Home, School and Community Record of the Children.
¶ 34. In Park's second issue, he disputes the chancellor's resolution of this factor. For brevity's sake, we combine this issue with our analysis of Park's first issue.
¶ 35. Under this factor, the chancellor found:
The children are excellent students and have good grades in school. The children's teacher, Zan Lumpkin, testified that the children appeared to be better prepared for lessons during the time they are with their mother. It is undisputed that both parties have assisted the children with homework.
The children attend church with both parents. They serve as acolytes at Park's church.
Park has enrolled the children in line dancing classes. At the beginning of the trial he testified that he and the children would travel to Mobile, Alabama two nights per week to engage in line dancing at Austin's Nightclub where Park was employed as a line dance instructor. Park testified that alcoholic beverages are available at Austin's but he does not partake in this activity. The Court does not find that this is a proper environment within which to bring 11 year old children where they are exposed to the consumption of alcohol. On the last day of trial it was revealed that Park was also an instructor of line dance at an RV resort in Mobile, Alabama where he regularly took the children to engage in this extra curricular activity. This job led to the relationship between Park and another woman which ended with her marriage proposal to Park.
The testimony revealed that Casi's activities with the children have been in the home and in the neighborhood where they reside.
Accordingly, the chancellor found that this factor favored Casi.
¶ 36. Park claims the chancellor's findings were clearly erroneous. We disagree. True enough, Zan Lumpkin testified that the children's clothes were more neatly pressed and that Tatiana's hair was "fuzzier" during the weeks Park had custody of the children. Lumpkin also testified that there was no difference in the children's homework during the weeks that Park had the children and that, regardless of whether Park or Casi had custody of the children during a given week, the children occasionally left materials at either Park's or Casi's house. Additionally, while the chancellor found that Park took the children to a nightclub on Friday nights and that alcohol was served there, there was no testimony to that. To the contrary, Park testified that he never took the children to the nightclub on Friday nights. Instead, Park testified that he left the children with his parents when he went to that nightclub. Still, given the bulk of the testimony and the numerous considerations under the Albright factors, we cannot find that this one factual error renders the chancellor's entire decision clearly erroneous.
¶ 37. Park then, yet again, rehashes his involvement in the children's extracurricular activities and claims that Casi "does nothing with the children but shop and *379 watch television." Again, that is patently false and contrary to the evidence. The evidence showed that Casi took the children to various high school sports activities, that she lacked funds to take the children to certain other activities, and that Casi felt as though the children were disproportionately involved in dance classes and that, because of that disproportionate involvement, the children needed to tend to their school work and to socialize with their friends so they did not have time for any additional extracurricular activities.
g. Other Relevant Factors
¶ 38. Under this heading, Park submits that the chancellor erred when she did not adequately quote his witnesses. True enough, the chancellor did not quote every one of Park's witnesses in her findings of fact and conclusions of law, but that does not render her decision clearly erroneous. She mentioned many of Casi's witnesses but only because Park, Park's mother, and Park's sister claimed that Casi had an uncontrollable temper, and that Casi's co-worker's and friends all testified that they had never witnessed such a temper. The chancellor chose to believe Casi's witnesses over Park's. We are not prepared to substitute our view for the chancellor's.
III. WHETHER THE COURT USED AN INCORRECT LEGAL STANDARD IN AWARDING CUSTODY, AMOUNTING TO REVERSIBLE ERROR.
¶ 39. In this issue, Park claims that the chancellor committed reversible error when she gave Casi "paramount care, custody and control" of the children. Park cites Section 93-5-24 of the Mississippi Code Annotated (Rev.2004). Pursuant to Section 93-5-24:
(1) Custody shall be awarded as follows according to the best interests of the child:
(a) Physical and legal custody to both parents jointly pursuant to subsections (2) through (7).
(b) Physical custody to both parents jointly pursuant to subsections (2) through (7) and legal custody to either parent.
(c) Legal custody to both parents jointly pursuant to subsections (2) through (7) and physical custody to either parent.
(d) Physical and legal custody to either parent.
It is clear from the context of the chancellor's findings of fact, including the chancellor's provisions regarding Park's visitation, that the chancellor awarded sole physical custody to Casi. It is likewise clear from the chancellor's judgment that the chancellor awarded sole legal custody of the children to Casi.
IV. WHETHER THE COURT ABUSED ITS DISCRETION AND COMMITTED MANIFEST ERROR IN GRANTING CASI PERIODIC ALIMONY.
¶ 40. In his final issue, Park claims the chancellor erred when she awarded Casi $375 per month in periodic alimony. Park submits that the chancellor (a) failed to properly consider equitable distribution before she considered whether alimony was necessary, (b) failed to properly consider his and Casi's wage earning capacities, and (c) over-emphasized his marital misconduct and under-emphasized Casi's marital misconduct. We are mindful that alimony awards are within the discretion of the chancellor. Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss. 1993). We will not reverse the chancellor's decision unless the chancellor committed *380 manifest error, an abuse of discretion, or applied an erroneous legal standard. Id.
a. Equitable Distribution.
¶ 41. Park draws our attention to Cosentino v. Cosentino, 912 So.2d 1130 (Miss.Ct.App.2005). In Cosentino, this Court found reversible error when a chancellor did not properly consider certain relevant equitable distribution factors discussed in Ferguson v. Ferguson, 639 So.2d 921, 929 (Miss.1994) prior to finding that an award of periodic alimony was appropriate. Id. at (¶ 12). "If after the equitable distribution of the marital property, both parties have been adequately provided for, then an award of alimony is not appropriate." Johnson v. Johnson, 650 So.2d 1281, 1287 (Miss.1994).
¶ 42. When the chancellor ordered each party to submit proposed findings of fact and conclusions of law, the chancellor specifically noted that equitable distribution was to be considered before alimony was to be discussed. In the chancellor's findings of fact and conclusions of law, the chancellor stated that, at trial, the "parties stipulated . . . to pay the marital debt with proceeds from the sale of the marital home." The chancellor also ordered the parties to split equally the debt payable to Merchants and Marines Bank. The chancellor detailed just how Park and Casi were to equally split the two mortgages on the marital home until it could be sold. The chancellor then stated, "[i]n accordance with the stipulation of the parties, the personal property of the marriage was valued and distributed as set out in Exhibit No. 20 with Casi receiving personal property valued at $6,399.00 and Park receiving personal property valued at $3,230.00." Accordingly, the chancellor considered equitable distribution in her findings of fact and conclusions of law. Afterwards, the chancellor considered whether Casi should receive alimony.
¶ 43. Further, according to the judgment:
the parties stipulated at trial to pay the marital debt with proceeds from the sale of the marital home with the exception of the debt to Merchants and Marine Bank. The Court, after considering the evidence, finds that the debt was incurred during the course of the marriage and the Court finds that both parties shall be equally responsible for payment of the debt to Merchants and Marine Bank.
The Court finds that until the home is sold, [Casi] shall retain the exclusive use and possession of the home and the parties shall equally divide the current first mortgage payment which encumbers the home until the home is sold. Likewise, the parties shall equally divide the payment of the second mortgage encumbering the marital home. The shared payments shall be accomplished by [Park] forwarding his 1/2 of the payments to [Casi] by the 1st day of each month and [Casi] shall be responsible for forwarding the same to appropriate financial institutions.
The Court finds that in accordance with the stipulations of the parties, the personal property of the marriage was valued and distributed as set forth in Exhibit No. 20, with Casi . . . receiving personal property valued at $6,399.00 and Park . . . receiving personal property valued at $3,230.00.
The chancellor then discussed the need for alimony. Accordingly, it is clear that the chancellor considered equitable distribution prior to considering alimony. That is, the chancellor noted that the parties stipulated to the distribution of their marital property and the chancellor divided the *381 marital debt. As such, we cannot find that the chancellor erred.
b. Wage-Earning Capacities.
¶ 44. Park argues that the chancellor failed to consider his and Casi's actual earnings. According to Park, in Casi's financial declaration, Casi listed her income, exclusive of child support, at around $1,000 per month. Park claims that Casi omitted income she received for taking tickets at school sporting events. Park notes that Casi made $10 per hour when she took tickets and that she sometimes earned as much as $300 per month. There is no evidence that the chancellor failed to consider Casi's additional income. That is, the chancellor did not specifically refer to Casi's monthly income. Likewise, the chancellor did not specifically refer to Park's income. It is possible that the chancellor considered Casi's additional income, and it is also possible that the chancellor did not. Given our deferential standard of review, we cannot find clear or manifest error.
¶ 45. Next, Park claims that the chancellor failed to consider certain relevant facts regarding his income. First, Park submits that the chancellor improperly calculated his wage-earning capacity. According to Park, the chancellor should have realized that Park's wage documents were based on a variable hourly basis and that he could not work fifty hour work weeks as he once did. Park's testimony indicated that he would like to work a forty hour work week. We cannot find that the chancellor erred by referencing Park's actual work hours instead of Park's hopeful or tentative work hours.
c. Misconduct.
¶ 46. Park submits that the chancellor placed undue emphasis on the affair he had with Pamela Skeeters and too little emphasis on Casi's misconduct. According to Park, Casi provoked the separation because she withheld physical intimacy and, on one occasion, she hit Park and yelled at him that she did not need him or any other man, and told him to leave the house. Casi did not deny that she did so. Casi also testified that she did so after Park nearly "kicked her door in" and "called her an ugly name." Park admitted that he called Casi a "b____."
¶ 47. Park cites Culver v. Culver, 383 So.2d 817 (Miss.1980) for the concept that lack of physical intimacy is grounds for a divorce for habitual cruel and inhuman treatment. Be that as it may, Park and Casi agreed to divorce based on irreconcilable differences, so it is entirely irrelevant that lack of physical intimacy is grounds for a fault-based divorce. In considering whether one party should receive alimony, it is within the chancellor's discretion to weigh each party's marital fault. There was substantial evidence to support the chancellor's decision. We will not substitute our opinion for the chancellor's.
¶ 48. THE JUDGMENT OF THE GEORGE COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR. IRVING, J., NOT PARTICIPATING.
NOTES
[1] During the course of the proceedings, the parties frequently referred to Park Austin Tritle as "Parkie." To distinguish the father from the son, we will do the same.
[2] During their separation, Park and Casi voluntarily entered a temporary agreement by which Park and Casi shared custody of the children. Park had the children one week and Casi had the children the next week. Park also voluntarily paid Casi $400 in child support every month.
[3] The parties went before the chancellor on January 11-12, 2005. Because Park and Casi had not finished presentation of evidence, the matter was reset for February 22, 2005. Again, the chancellor had to reset the matter for May 10, 2005. The trial concluded on May 10th.