ROBERTS, J.,
for the Court:
¶ 1. This appeal arises out of a child-custody dispute between Mary Jane Borden and Edward Shannon Borden (Shannon). The Lee County Chancery Court awarded primary physical custody of the parties’ two minor children to Shannon. Mary Jane appeals and claims that the chancellor’s application of the factors discussed in Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983), was not supported by substantial credible evidence. Mary Jane also claims that the chancellor awarded custody of the children to Shannon to punish her for her extramarital communications with other men. Additionally, Mary Jane argues that the chancellor erred by failing to summarize the guardian ad litem’s recommendations, and by failing to explain why the chancellor rejected the guardian ad litem’s recommendations. Shannon cross-appeals and argues that the chancellor erred by declining to award him reasonable attorney’s fees related to his defense against Mary Jane’s claim that he had abused the children. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. Shannon and Mary Jane were married in Memphis, Tennessee, on September 10, 2000. During the marriage, the couple had two children, Elijah (Eli), born December 5, 2002, and William, born November 20, 2006. Shannon worked in a management position for Penske Trucking Company. Mary Jane worked full-time as *1170 a nurse at St. Joseph’s Hospital. In 2005, the couple moved to Tupelo, Mississippi, due to Shannon’s job transfer. Mary Jane continued to work as a nurse in Memphis, but she only worked sixteen days per year. When she worked in Memphis, she stayed there overnight.
¶3. After the move to Tupelo, Mary Jane and Shannon began to experience problems in their marriage. The couple separated on August 16, 2010. Mary Jane picked up the oldest child from school and took both children with her to her parents’ home in Tennessee. Mary Jane did not tell Shannon she was leaving. Mary Jane also took her computer with her.[1] Two days later, Shannon filed a complaint for divorce on the grounds of habitual cruel and inhuman treatment and irreconcilable differences. On August 20, 2010, Mary Jane filed her answer and counter-complaint for • divorce on the same grounds.
¶ 4. On August 30, 2010, Mary Jane filed a motion to appoint a guardian ad litem and for a forensic examination of the children. According to Mary Jane, Eli and William exhibited behavior that led Mary Jane to believe they had been sexually abused. Although Mary Jane never alleged that anyone in particular had abused the children, she states in her brief that her suspicion of sexual abuse “arose from (1) alarming statements made by the children, and (2) bizarre responses given by Shannon.” The chancellor appointed Jonathan Martin as guardian ad litem to investigate the allegations and represent the interests of the children. The guardian ad litem interviewed Shannon, Mary Jane, their two children, and several other individuals. The guardian ad litem also had polygraph examinations administered to both Mary Jane and Shannon. The re-suits of the polygraph examinations showed that both parties were being truthful. However, the investigation revealed no evidence that the children had been sexually abused. Based on his Albright analysis, the guardian ad litem recommended that Mary Jane receive primary physical custody of the children.
¶ 5. On November 9, 2010, Mary Jane and Shannon entered an agreed temporary order based on the guardian ad litem’s recommendations. The parties were awarded joint legal custody of the children, and Mary Jane was awarded primary physical custody. Shannon was awarded reasonable visitation.
¶ 6. On November 30, 2010, Shannon filed an amended complaint to include adultery as an additional ground for divorce. Shannon alleged that prior to their separation, Mary Jane had engaged in extramarital affairs with two of her old high-school classmates, Eric Brown and Brian Hurt. Brown and Hurt both lived in Memphis. Sometime between January 2008 and November 2009, Mary Jane reconnected with Brown and Hurt via Facebook.
¶ 7. During October 2009, Mary Jane was photographed with both Brown and Hurt at a bar in Memphis. In July 2010, Mary Jane went to a friend’s birthday party in Memphis, where both Hurt and Brown were present. Mary Jane admitted to communicating with Hurt and Brown via Facebook, but she denied that she had an extramarital affair with either of them. However, Mary Jane admitted that she engaged in inappropriate sexual communications with Brown through Facebook. She also admitted that she and Brown met in Tupelo during November 2Q09. Brown picked her up at a shopping center across *1171 the street from his hotel room. They then went back to Brown’s hotel room, but their meeting was interrupted by a surprise visit by Brown’s wife, who confronted Mary Jane regarding her inappropriate Face-book communications with'Brown.
¶ 8. The parties went to trial on August 8-11 and September 26, 2011. During the trial, Shannon introduced a seventy-five page transcript of Facebook chats between Mary Jane and Brown. The chats, which contained numerous sexual references, began in November 2009. Suffice it to say, some of the messages were quite explicit. According to Mary Jane, her inappropriate Facebook chats with Brown occurred during a period where she and Shannon were experiencing difficulties in their marriage. Mary Jane also testified that her children were not home during her inappropriate contact with other men.
¶ 9. Ultimately, the chancellor found that there was insufficient evidence to award Shannon a divorce from Mary Jane based on adultery. The chancellor also found insufficient evidence to award either party a divorce based on habitual cruel and inhuman treatment. Thus, the chancellor declined to award a divorce. But the chancellor awarded primary physical custody of the children to Shannon. The chancellor also declined to award Shannon attorney’s fees related to the expenses associated with his defense against Mary Jane’s claim that the children had been abused. Mary Jane appeals, and Shannon cross-appeals.
STANDARD OF REVIEW
¶ 10. In cases involving the award of child custody, “[t]his Court will not disturb the factual findings of the chancellor unless [they] are manifestly wrong or clearly erroneous.” Brekeen v. Brekeen, 880 So.2d 280, 283 (¶ 4) (Miss.2004) (quoting Jerome v. Stroud, 689 So.2d 755, 757 (Miss.1997)). “[I]f there is substantial evidence in the record to support the chancellor’s findings, we will not reverse.” Tanner v. Tanner, 956 So.2d 1106, 1108 (¶ 5) (Miss.Ct.App.2007) (citing Wilbourne v. Wilbourne, 748 So.2d 184, 186 (¶ 3) (Miss. Ct.App.1999)).
ANALYSIS
I. CUSTODY
¶ 11. Mary Jane contends that the chancellor’s application of the Albright factors was contrary to the weight of the evidence. It is well settled that “the polestar consideration in ehild[-]eustody cases is the best interest and welfare of the child.” Albright, 437 So.2d at 1005. To determine which parent is better suited to have primary physical custody of the children, the chancellor must consider the following factors:
1) age, health and sex of the child; 2) determination of the parent that had the continuity of care prior to the separation; 3) which has the best parenting skills and which has the willingness and capacity to provide primary child care; 4) the- employment of the parent and responsibilities of that employment; 5) physical and mental health and age of the parents; 6) emotional ties of parent and child; 7) moral fitness of parents; 8) the home, school, and community record of the child; 9) the preference of the child at the age sufficient to express a preference by law; 10) stability of home environment and employment of each parent; 11) other factors relevant to the parent-child relationship.
Hollon v. Hollon, 784 So.2d 943, 947 (¶ 12) (Miss.2001) (citing Albright, 437 So.2d at 1005). “All [Albright] factors are important, but the chancellor has the ultimate discretion to weigh the evidence the way he sees fit.” Thurman v. Johnson, 998 So.2d 1026, 1030 (¶ 18) (Miss.Ct.App.2008) *1172 (quoting Johnson v. Gray, 859 So.2d 1006, 1013-14 (¶ 36) (Miss.2003)).
¶ 12. The chancellor found that the following factors favored Shannon: age, health, and sex of the children; parenting skills; willingness and capacity to provide primary child care; moral fitness of the parents; home, school, and community record of the children; and stability of the home environment. The chancellor only found that the continuity-of-care factor favored Mary Jane. The chancellor concluded that the remaining factors did not favor either party. Mary Jane argues that the chancellor punished her for her inappropriate communications with Brown and Hurt by denying her custody of the children. She also argues that the chancellor punished her for her unfounded allegations of child abuse.
¶ 13. It is undisputed that the guardian ad litem’s investigation revealed no evidence of child abuse. The chancellor considered Mary ■ Jane’s allegations of child abuse under the parenting-skills factor:
[Mary Jane] turns around and tries to bolster her case, I think, really, makes these false accusations, which she later admits[,] and even the guardian ad litem states[,] there was. no credible evidence to support them[,] and the polygraph test clearly indicates that, that [Shannon] ..clearly passed that. There was nothing to that. That’s not a very good parenting skill to advance against the father of your children unless you know it’s for sure.
¶ 14. We find that the chancellor acted within his discretion when he weighed Mary Jane’s allegations under the parenting-skills factor. The chancellor related his analysis of Mary Jane’s unfounded accusations to her skills ■ as a parent. ■ It would have been within the chancellor’s discretion to conclude that' Mary Jane raised those allegations to obtain a tactical advantage against Shannon. And although it is reasonable to conclude that the chancellor did not consider Mary Jane’s unfounded allegations favorably to her, nothing suggests that the chancellor intended to punish Mary Jane for them.'
¶ 15. It was also within the chancellor’s discretion to negatively weigh Mary Jane’s inappropriate and extensive contact with Brown and Hurt. Mary Jane’s conduct weighed heavily against her in that the chancellor found that her extramarital contact with the two men negatively affected her responsibility as a parent. The chancellor stated:
[W]e also see that in all of this, [Mary Jane] is making inappropriate contact with these two people that I’ve already mentioned, Mr. Hurt and Mr. Brown. She should have been at home taking care of those children or should have been with them instead of out partying in Memphis[,] or [wherever] she was[,] at the night spots and going out on the town and meeting with another man here at a motel.
¶ 16. The record clearly shows that the chancellor carefully weighed.each Albright factor, and he acted within his discretion when he held that six of those factors favored Shannon, as opposed to only one that favored Mary Jane. Although reasonable minds could weigh the evidence and reach different conclusions, the chancellor did not abuse his discretion when- he applied the Albright factors. The dissent would reverse the chancellor’s judgment and award Mary Jane custody of the children, thus rendering a judgment in Mary Jane’s favor. With utmost respect for the dissent, our standard of review does not include reweighing the evidence or substituting our opinion for the chancellor’s. It is the chancellor’s responsibility to “hear the evidence, assess the credibility of the witnesses, and determine, ultimately what *1173 weight and worth to afford any particular aspect of the proof.” Tritle v. Tritle, 956 So.2d 369, 373 (¶ 8) (Miss.Ct.App.2007). “Even if we would have given greater weight to different testimony, so long as substantial credible .evidence supports the chancellor’s decision, we will not substitute our opinion for the chancellor’s.” Id. The chancellor could have certainly found that Mary Jane was evasive during her testimony as an adverse witness. We find no merit to Mary Jane’s claim that the chancellor awarded Shannon primary custody of the children as a means to punish her for her inappropriate conduct with other men or her false allegations of child abuse. Thus, we affirm the chancellor’s award of primary custody to Shannon.
II. RECOMMENDATIONS OF THE GUARDIAN AD LITEM
¶ 17. Next, Mary Jane argues that the chancellor’s failure to provide a summary of the guardian ad litem’s recommendations and the reasons that he rejected those recommendations was reversible error. “[Tjhere is no requirement that the chancellor defer to the findings of the guardian ad litem[.]” S.N.C. v. J.R.D., 755 So.2d 1077, 1082 (¶ 17) (Miss.2000). However, the chancellor “shall include at least a summary review of the qualifications and recommendations of the guardian ad litem in his findings of fact and conclusions of law” when the appointment of a guardian ad litem is statutorily required. J.P. v. S.V.B., 987 So.2d 975, 982 (¶ 20) (Miss.2008) (citing S.N.C., 755 So.2d at 1082 (¶ 18)). Further, “if the court rejects the recommendations of the guardian, the court’s findings must include its reasons for rejecting the guardian’s recommendations.” Id. (citing Floyd v. Floyd, 949 So.2d 26, 29 (¶ 8) (Miss.2007)).
¶ 18. Mississippi Code Annotated section 93-5-23 (Rev.2013) requires the appointment of a guardian ad litem when there are allegations of child abuse. Here, the chancellor properly appointed a guardian ad litem after Mary Jane raised her allegations of child abuse. Though the allegations turned out to be unfounded, the guardian ad litem recommended that Mary Jane have primary physical custody of the children. Specifically, the guardian ad li-tem stated:
[I] would recommend to the Court a finding that it’s in the best interest of the minor children that ... primary physical custody ... be vested with [Mary Jane], with [Shannon] enjoying visitation as set by this Court.
[[Image here]]
I did not find ... that [Mary Jane’s] conduct reflected on her as a parent but rather as a. poor spouse.
Regarding the guardian ad litem’s recommendations, the chancellor stated:
I’ve also considered the ... guardian ad litem’s recommendations here. To some extent, I disagree with those, and to some extent, I’ve agreed. But I find under the circumstances and based on these factors under Albright that the primary physical care, custody and control of these two minor children will be and the same is hereby awarded to the father.
¶ 19. As previously stated, the chancellor was not bound by the guardian ad litem’s recommendations. “[I]n custody cases,- we are bound by our limited standard of review and may reverse only when the decision of the trial court was manifestly wrong or clearly erroneous, or an erroneous legal standard was employed.” Hensarling v. Hensarling, 824 So.2d 583, 587 (¶ 8) (Miss.2002). The dissent finds that reversible error results from the fact that the chancellor did not summarize the guardian ad litem’s recommendations or explain his decision to reject them in part. *1174 However, in Ethridge v. Ethridge, 926 So.2d 264, 267 (¶ 13) (Miss.Ct.App.2006), this Court found that a chancellor did not err when he “only referred explicitly to the guardian ad litem’s report one time in his opinion.” Here, the chancellor clearly stated that he had considered the guardian ad litem’s recommendations. Based on the chancellor’s thorough application of the Al-bright factors, he determined that it was in the children’s best interest for Shannon to receive primary custody of the children. The chancellor found that Shannon was the more responsible parent, and was better suited to care for the children. And the chancellor provided his reasons during his Albright analysis. Thus, we find no error in the chancellor’s decision.
CROSS-APPEAL
¶ 20. In his cross-appeal, Shannon argues that the chancellor erred in failing to award him attorney’s fees and costs for defending Mary Jane’s allegations of child abuse. The chancellor ordered that the guardian ad litem’s fees be split equally between Shannon and Mary Jane, but ruled that Shannon was not entitled to attorney’s fees with respect to defending himself against Mary Jane’s allegations. Though the investigation revealed no evidence of abuse on the part of Shannon, that in and of itself did not entitle Shannon to compensation for defending the allegations. Primarily, the motion for appointment of a guardian ad litem was filed in the best interest of the children. Further, Mary Jane did not expressly accuse Shannon of abusing the children, although she tacitly did so. Nevertheless, the purpose of the forensic examination was not to prove or disprove that Shannon sexually abused the children, but merely to investigate circumstances surrounding statements allegedly made by the children. Shannon is not automatically entitled to attorney’s fees just because there was no evidence that he abused the children.
¶ 21. “An award of attorney’s fees in domestic cases is largely a matter entrusted to the sound discretion of the trial court.” Zeman v. Stanford, 789 So.2d 798, 806 (¶ 30) (Miss.2001) (citing Poole v. Poole, 701 So.2d 813, 818 (Miss.1997)). “Unless the chancellor is manifestly wrong, his decision regarding attorney’s fees will not be disturbed on appeal.” Id. (citing Bredemeier v. Jackson, 689 So.2d 770, 778 (Miss.1997)). We find no error in the chancellor’s decision not to award attorney’s fees to Shannon, nor in his decision that each party pay one-half of the guardian ad litem’s fees. Thus, Shannon’s cross-appeal is without merit.
CONCLUSION
¶ 22. We find no error in the chancellor’s Albright analysis, as his findings were supported by substantial credible evidence. The chancellor was not required to defer to the guardian ad litem’s recommendations. Further, the chancellor acted within his discretion when he denied Shannon’s request for attorney’s fees. Accordingly, we affirm the chancellor’s judgment.
¶ 23. THE JUDGMENT OF THE LEE COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. JAMES, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION.

. Mary Jane’s computer was later destroyed. According to Mary Jane, her mother threw her computer away. Mary Jane denied that she attempted to conceal evidence that could have been harmful to her case.